UNITED STATES *v.* KELLOGG CO.

**No. 7251.**—Invoice dated Toronto, Canada, November 20, 1945.
Entered at Omaha, Nebr., December 11, 1945.
Entry No. 84–A.

(Order dated May 23, 1947)

*Paul P. Rao,* Assistant Attorney General (*Howard L. Harawitz,* special attorney), for the plaintiff.
No appearance for the defendant.

**ORDER**

MOLLISON, Judge: On September 10, 1945, the defendant herein entered into a contract with the firm of Parrish & Heimbecker, Ltd., of Toronto, Ontario, Canada, involving the sale by the latter to the former of 30 tons of ground refuse screenings. The sale price was $20 per ton, United States currency, on an f. o. b. Omaha, Nebr., duty and all other charges paid, basis. Shipment under the contract was made November 26, 1945, from Port Arthur, Ont., and the consular and commercial invoices express the foregoing price and terms.

The screenings were entered at the port of Omaha at the invoice value, less freight, duty, and brokerage fees, or at a net entered value of $12.30 per ton, packed. The merchandise was appraised by the appraiser at the subport of Omaha as entered, but upon re-examination of the appraisement by the appraising officers at the headquarters port of Chicago, recommendation was made that the collector file an

appeal for reappraisement with this court under the provisions of section 501 of the Tariff Act of 1930 (19 U. S. C., 1940 ed., § 1501), which resulted in the present appeal.

When the case was called for trial there was no appearance on behalf of the defendant, and I find in the official file a letter on what appears to be the stationery of the defendant, dated October 22, 1946, signed by one F. F. Purdy, who styles himself "Purchasing Agent, Omaha Plant," wherein it is stated that it was the intention of the defendant not to appear at the hearing of this matter.

Although there is no statement to that effect in the official papers, the examiner in the Chicago appraiser's office who recommended the appeal for reappraisement in this case testified that entry and appraisement were made on the basis of export value. There is uncontradicted evidence to the effect that at the time of exportation of the merchandise involved, refuse ground screenings were not permitted by the Canadian government to be sold in Canada for home consumption, which would indicate that no foreign value therefor existed. Section 402 (d) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1402 (d)), which is the statutory formula for export value, is set forth in the margin.[1]

It appears that refuse ground screenings are fungible goods and that there is no question in this case as to "such" or "similar" goods within the meaning of the statute.

It likewise appears that the manner of offering such merchandise in the foreign market was as follows: The screenings were offered at prices which represented a delivered, duty-paid price f. o. b. certain American cities or groups of cities, to wit, Duluth, Chicago, Buffalo, New York-Philadelphia-Baltimore, and Boston. The evidence shows that the prices to each of these cities or groups were not uniform and that the variation was not entirely accounted for by the difference in shipping costs from Canada to the various cities or groups of cities.

For example, the evidence (exhibit 3) shows that on the date of exportation of the instant merchandise, November 26, 1945, offerings were made by a Toronto grain dealer of ground Canadian refuse screenings at the following duty-paid f. o. b. prices per ton (in United States currency):

For shipment to:

| | |
|---|---|
| Duluth | $31. 50 |
| Chicago | 34. 10 |
| Buffalo | 38. 30 |
| New York, Philadelphia, Baltimore | 39. 50 |
| Boston | 39. 90 |

[1] (d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

When the duty, freight, and brokerage fees are deducted from the above prices, the following net return to the shipper (in effect, an f. o. b. Port Arthur, Ont., price (in United States currency)) would have been as follows in each case:

For shipment to:

| | |
|---|---|
| Duluth | $25. 50 |
| Chicago | 25. 57 |
| Buffalo | 30. 86 |
| New York, Philadelphia, Baltimore | 30. 06 |
| Boston | 29. 12 |

It is the position of the plaintiff that the highest net return, viz, that which would have been obtained by the offerer on the offer for delivery at Buffalo, $30.86 per ton, represents the export value of the imported merchandise. In support of this position there are cited *United States* v. *Mexican Products Co.*, 28 C. C. P. A. (Customs) 80, C. A. D. 129, and *United States* v. *Zellerbach Paper Co.*, 28 id. 303, C. A. D. 159.

The plaintiff argues that the rationale of the cited cases is that the term "freely offered for sale to all purchasers," in cases where offers are made in the usual wholesale quantity at varying prices, must be interpreted as though the words were "freely offered for sale to the least-favored purchaser." The underlying theory seems to be that under such circumstances the highest of the prices at which merchandise is offered represents the market value, since it is the only price at which all who care to purchase such merchandise might buy it.

The *Mexican Products Co.* case involved a discount structure, and it appeared that the discount from the basic list prices allowed by the seller varied according to the status or bargaining ability of the purchaser, and not according to the quantity purchased. The merchandise was, however, freely offered for sale at the list prices, and there was no evidence that it was freely offered for sale to all purchasers at prices less than such list prices.

I do not consider the decision of the Court of Customs and Patent Appeals in the *Mexican Products Co.* case to have been predicated upon a least-favored-purchaser theory. Nowhere in the decision is that even remotely suggested. The decision, to my mind, was based upon the well-established interpretation of the language of the value provisions that they contemplate but one market value or price. In that case there were numerous prices at which *certain* purchasers might buy, but the only offer open to *all* who cared to buy was at the list prices.

This view is strengthened by the decision of the appellate court in the *Zellerbach Paper Co.* case. In that case, which involved foreign value, the seller offered the merchandise for sale for home consumption in Germany at a uniform price which included freight to the place where the buyer was located. This, of course, resulted in a varying

net return to the seller, depending upon the distance from his factory to the buyer's place of business which controlled the amount of freight the seller would have to pay.

The court pointed out that—

* * * It is true that the seller did not obtain from each of the purchasers the same net amount of money, and right here is the crux of the case. The mandate of the statute does not provide that there shall be one price received by the seller, but that the price accepted as foreign value shall be that at which such or similar merchandise is freely offered to all purchasers.

It is too obvious to permit of extended discussion that if the importer's contentions were sustained, there would be in Germany, on the date of exportation of the instant merchandise, numerous *prices* for identical merchandise, one price to those living in Bremen and a higher price for those living at or near the place of manufacture. * * * [Italics quoted.]

In this case, the offerer would have obtained a varying net return had sales resulted from his offers for shipment to different American cities or groups of cities. Since the grain market is well known to be a highly organized and competitive one, it is quite logical that the differences in the returns upon shipment to various cities or groups of cities, aside from freight costs, were attributable to competitive conditions in the cities or areas named. However, none of the prices at which the merchandise was offered was a *freely* offered price, for each was qualified and restricted by requiring shipment to a designated city or area in the United States in order to obtain the price quoted. Likewise, this manner of offering the goods negatives the existence of a true export value since the statute contemplates a situation in which it is possible to arrive at a figure representing "the price at which they could be bought at the principal market, less the expense of moving them out of the country." (*United States* v. *Heffernan Paper Co.*, 13 Ct. Cust. Appls. 593, T. D. 41454.) Deduction of the expenses of moving screenings such as or similar to those at bar out of the country of exportation would result in a series of unrelated prices, none of which represents statutory export value.

I conclude, therefore, that no export value, within the meaning of the statute, existed for the screenings in issue. As has been pointed out hereinbefore, no foreign value therefor existed. Under the provisions of section 402 (a) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1402 (a)), in the absence of both foreign or export value, recourse must be had to United States value, the statutory formula for which is set forth in the margin.[2]

---

[2] (e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale, for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods. (Sec. 402 (e), Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (T. D. 49646).)

Since the case was tried on the theory that an export value existed for the merchandise at bar, no effort was made to adduce proof of the elements of any other basis of value. Under the circumstances, I deem it to be in the interests of justice that the case be restored to the calendar for the production of such proof.

It is so ordered.